UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTHONY NEUMEISTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:10-cv-659- SEB-MJD |
| vs. | ) | |
| | ) | |
| CITY OF GREENFIELD, GREENFIELD | ) | |
| POLICE DEPT., MAYOR BRAD | ) | |
| DEREAMOR, in his official and individual | ) | |
| capacities, and CHIEF OF POLICE JOHN | ) | |
| JESTER, in his official and individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**
(Docket No. 36)

This case arises out of Plaintiff's employment with the City of Greenfield Police Department

and involves claims brought pursuant to 42 U.S.C. § 1983, Indiana's Whistleblower statute found

at Indiana Code § 36-1-8-8, and state contract law. Now before the Court is Defendants' Motion

for Summary Judgment, filed at Docket No. 36. For the reasons set forth in this entry, Defendants'

motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

Anthony Neumeister ("Plaintiff") became a reserve officer with the City of Greenfield Police

Department in 1998. [Plaintiff's Dep., p. 26, l. 19 - 22 (Dkt No. 42-1).] He was hired on as a full-

time patrolman in June of 2001. [Id., p. 26, l. 19 - 22 (Dkt No. 42-1).]

### A. Plaintiff's Prior Lawsuit

On July 18, 2007, Plaintiff filed a lawsuit in this court naming as defendants the City of Greenfield, former Mayor Rodney Fleming, and former Police Chief Clarke Mercer (the "Prior Lawsuit"). [Complaint in Prior Lawsuit (Dkt. No. 38-1)]. In the Prior Lawsuit, assigned Cause Number 1:07-cv-939 DFH-WTL, Plaintiff accused the defendants of retaliating against him with respect to the conditions of his employment after he publicly stated his intent to vote for mayoral candidate Brad Dereamor rather than then Police Chief Mercer's favored candidate, Dick Pasco.[1] [Id.] The Prior Lawsuit was resolved by a settlement and closed on the Court's docket on March 18, 2008. [Settlement and Release Agreement (Dkt No. 38-3); Clerk's Entry in 1:07-cv-939 DFH-WTL (Dkt. No. 18)].

In resolving the Prior Lawsuit, the parties executed a Settlement and Release Agreement, which provided, in pertinent part, that Plaintiff would dismiss his claims in exchange for: (1) a monetary payment of $18,000; (2) the reinstatement of his contract "to cut grass at the Greenfield Police Department and shooting range, effective January 1, 2008;" (3) the reinstatement of his contract "to remove snow from the Greenfield Police Department's property;" (4) the promise that he would be sent to Drug Recognition Examiner school; and (5) the promise that he would be given "an opportunity to apply for promotion and given fair consideration in the selection process." [Settlement and Release Agreement (Dkt No. 38-3).]

### B. Plaintiff's Lawn Cutting/Snow Removal Contracts

The terms of Plaintiff's contracts to cut grass and remove snow were never memorialized in writing either before or after the parties executed the Settlement and Release Agreement, and the

---

[1] Brad Dereamor won that particular mayoral election and is a defendant in the instant litigation.

parties never discussed the length or duration of those contracts or the circumstances under which either party could terminate the contracts. [Plaintiff's Dep., p. 113, l. 12 - 25 (Dkt No. 42-1).] Plaintiff believed that the parties' agreement was "a seasonal year by year type deal," but since the Prior Lawsuit was settled, Plaintiff has never cut the grass or removed snow from City property. [Id., p. 113, l. 4 - 7 (Dkt No. 42-1); Plaintiff's Complaint at ¶ 20 (Dkt. No. 1).]

### C. Drug Recognition Examiner School

Following the settlement of the Prior Lawsuit, Plaintiff has not attended Drug Recognition Examiner school. [Plaintiff's Complaint at ¶ 20 (Dkt. No. 1).]

### D. Plaintiff's Post-Lawsuit Applications for Promotion/Transfer

After the Prior Lawsuit was settled, Plaintiff continued working as a patrolman with the City of Greenfield Police Department. In 2008 and early 2009, he applied for the following promotions or lateral transfers within his rank, none of which he was awarded:

1. July 12, 2008 – Sergeant

2. July 12, 2008 – Corporal

3. September 2008 – Detective

4. September 2008 – Detective

5. October 4, 2008 – Sergeant

6. October 4, 2008 – Corporal

7. November 2008 – Detective

8. March 2009 – K-9 Officer

[Plaintiff's Response to Interrogatory No. 4 (Dkt. No. 38-2).]

<u>E.  Plaintiff's Relationship with Lieutenant Laymon
and July 2009 Complaint to the State Board of Accounts</u>

Plaintiff and the supervising lieutenant on the third shift, Lieutenant Scott Laymon, had a history of "personality conflicts" during their years as colleagues in the City of Greenfield Police Department,[2] a fact which was known to Chief John Jester (a defendant herein) and others within the Department.  [Jester Dep., p. 93, 5 - 10 (Dkt No. 42-2); Inman Dep., p. 28, l. 10 - 15 (Dkt. No. 42-3) (agreeing that the two men did not get along and describing their relationship as "tumultuous.").]  During the majority of his tenure with the Department, Plaintiff worked the second shift and, presumably, was able to avoid Lieutenant Laymon.  [Plaintiff's Dep., p. 57, l. 13 - 18 (Dkt. No. 42-1).]  However, from January 1, 2009 through sometime in July of 2009, Plaintiff was assigned to work the third shift under Lieutenant Laymon.  [<u>Id.</u>, p. 57, l. 23 - p. 58, l. 14 (Dkt. No. 42-1).]  Plaintiff's move to the third shift was not involuntary or unwelcome by him; he had asked to work the third shift at that time, and the move was "a decision [he] made on his own."[3]  [<u>Id.</u>, p. 58, l. 15 - p. 60, p. 1 (Dkt. No. 42-1).]

Although Plaintiff initially did not make it known to his superiors, the reason he asked to be moved to the third shift at that time was because he had heard rumors that Lieutenant Laymon was engaged in ghost employment – meaning that Lieutenant Laymon was "stealing time" or claiming time on his time sheets that he did not actually work – and, accordingly, Plaintiff believed that

---

[2]    Lieutenant Laymon joined the City of Greenfield Police Department at about the same time that Plaintiff did in 1998.  [Plaintiff's Dep., p. 90, l. 7 - 11 (Dkt No. 42-1).]

[3]    Notably, the Prior Lawsuit involved Plaintiff's allegation that Plaintiff had been involuntarily transferred to work the third shift "under" an unidentified officer with whom he did not get along in retaliation for supporting mayoral candidate Brad Dereamor.  [Complaint in Prior Lawsuit (Dkt No. 38-1).]

Lieutenant Laymon "needed to be caught . . . and reported." [Plaintiff's Dep., p. 58, l. 15 - p. 60, l. 23 (Dkt. No. 42-1).] Plaintiff wanted to "watch" Lieutenant Laymon in an effort to "observe" for himself and gather evidence of Lieutenant Laymon's suspected wrongdoing. [Id., p. 60, l. 2 - 19 (Dkt. No. 42-1).]

At some point, Plaintiff reported his suspicions about Lieutenant Laymon to several of his superiors, including Captains Joe Mundon and Brian Guinn, which prompted the Department to assign Detective Randy Ratliff to officially investigate the matter. [Plaintiff's Dep., p. 129, l. 21 - p. 130, l. 10 (Dkt. No. 38-1); see also Plaintiff's Response Brief at p. 9 (Dkt. No. 41).] Detective Ratliff conducted his official investigation during the months of April, May, and June of 2009. [Plaintiff's Dep., p. 132, l. 12 - 17 (Dkt. No. 42-1).]

Beginning in April of 2009, approximately four months after Plaintiff voluntarily transferred to the third shift, Plaintiff stopped speaking to Lieutenant Laymon. [Plaintiff's Dep., p. 90, l. 13 - p. 92, l. 8 (Dkt. No. 42-1).] He did so because he heard a rumor that Lieutenant Laymon had reported to Chief Jester that Plaintiff had made some less than complimentary remarks about the Chief's leadership, including statements to the effect that the Department "was no better [now] than it was [under the prior chief's administration]." [Id., p. 90, l. 13 - p. 92, l. 8 (Dkt. No. 42-1).] Plaintiff was not happy about Lieutenant Laymon's alleged comments to Chief Jester because he had not made such remarks and believed that Lieutenant Laymon had "lied" to Chief Jester to make him look bad. [Id., p. 90, l. 13 - p. 92, l. 8 (Dkt. No. 42-1).]

As a result of Detective Ratliff's investigation, which concluded in approximately June of 2009, Lieutenant Laymon received a three day suspension. [Plaintiff's Dep., p. 132, l. 12 - 17; p. 135, l. 1 - 9 (Dkt. No. 42-1).] However, Lieutenant Laymon was not disciplined for ghost

employment, but rather for "taking off the shift, leaving the shift short, as far as coverage." [Jester Dep., p. 89, l. 18 - 25 (Dkt. No. 42-2).] Although Plaintiff never discussed the results of the investigation with Detective Ratliff, Plaintiff felt that the three day suspension was not severe enough punishment and he voiced his opinion to several of his superiors, including Chief Jester, that the punishment given to Lieutenant Laymon was "bullshit."[4] [Plaintiff's Dep., p. 132, l. 18 - p. 136, l. 18 (Dkt. No. 42-1).]

In July of 2009, Plaintiff filed a complaint with the State Board of Accounts.[5] [Plaintiff's Dep., p. 83, l. 5 - p. 15 (Dkt. No. 38-5); Complaint at ¶ 22 (Dkt. No. 1).] He did so because he knew that the agency "could come in and might have had the manpower or resources to look and get to the bottom of the missing time that was no longer missing," and he suspected that the agency might effect a different "outcome" for Lieutenant Laymon. [Id., p. 83, l. 5 - 15 (Dkt No. 38-1).]

### F. State Board of Accounts Audit

Plaintiff's complaint prompted the State Board of Accounts to conduct an audit of the City of Greenfield Police Department. [Plaintiff's 9/23/2009 Memo to Chief Jester (Dkt. No. 38-13); Jester Dep., p. 90, l. 17 - p. 92, l. 92 (Dkt. No. 42-2).] On or about September 22, 2009, Chief Jester called a meeting at which he informed the members of the Department that the State Board of Accounts was conducting an audit based on a complaint from someone within the Department. [Jester Dep., p. 87, l. 4 - 8 (Dkt. No. 38 - 6); Plaintiff's 9/23/2009 Memo to Chief Jester (Dkt. No.

---

[4]     The record contains no facts relating to Plaintiff's own investigation of Lieutenant Laymon and whether Plaintiff discovered evidence of ghost employment that Detective Ratliff missed or overlooked – or, for that matter, whether Plaintiff discovered any evidence of ghost employment at all.

[5]     Plaintiff's written complaint to the State Board of Accounts is not part of the record in this case, so there is no evidence of exactly what Plaintiff alleged in that complaint.

38-13).]  Lieutenant Laymon sat in the back of the room during the meeting and made several remarks (which were audible to the other persons sitting in his vicinity) insinuating that Plaintiff was the person who had made the complaint.  [Plaintiff's 9/23/2009 Memo to Chief Jester (Dkt. No. 38-13).]  Plaintiff heard those remarks and considered them "unbecoming," "provoking," "disrespectful," "inappropriate," "hostile," "harassing" and "unprofessional;" thus, the very next day he filed a written grievance asking Chief Jester to impose "a harsh and appropriate disciplinary punishment" against Lieutenant Laymon for his conduct and statements.  [Id.]  Chief Jester did not sanction Lieutenant Laymon as Plaintiff requested.  [See Jester Dep., p. 93, l. 11 - p. 94, l. 1 (Dkt. No. 42-2).]

At the time contemporaneous to the State Board of Accounts audit, Plaintiff denied that he was the one who had complained to that state agency and tried to make everyone in the Department believe that it was not him.  [Defendants' Reply Brief, p. 10 - 11 (citing Plaintiff's Dep.) (Dkt. No. 37); see also Plaintiff's 9/23/2009 Memo to Chief Jester (Dkt. No. 38-13) ("I did not file any complaints, of any sort concerning this flex/comp time issue.").]

G.  Plaintiff's Applications for Promotion/Transfer
Post-July 2009 Complaint to State Board of Accounts

After complaining to the State Board of Accounts, Plaintiff applied for three additional promotions or lateral transfers within the Department, none of which he was awarded:

1. October 31, 2009 – Drug Task Force Detective

2. October 31, 2009 – Corporal

3. December 2009 – Interdiction/Traffic Safety Officer

[Plaintiff's Response to Interrogatory No. 4 (Dkt. No. 38-2).]

## H. The Interview Process

Chief Jester appointed the persons who sat on the panels charged with interviewing applicants for departmental promotion during all times relevant to Plaintiff's claims in this action. [Jester Dep., p. 27, l. 24 - 25 (Dkt. No. 38-6).] Lieutenant Laymon was on two of the three panels that considered candidates for the positions for which Plaintiff applied after July of 2009 – i.e., after Plaintiff complained to the State Board of Accounts. [Plaintiff's Dep., p. 129, 1 - 7 (Dkt. No. 42-1).]

At all times relevant to Plaintiff's claims in this action, the interview panels made recommendations to Chief Jester as to which candidate should be selected for promotion. [Jester Dep., p. 31, l. 25 - p. 32, l. 4 (Dkt. No. 38-6).] Chief Jester then sent that person's name to the Board of Works. [Jester Dep., p. 30, l. 5 - 19 (Dkt. No. 38-6).] The Board of Works had the final decision-making authority with respect to promotional decisions within the City of Greenfield. [Defendants' Brief, p. 5 (citing Ind. Code § 36-8-3-1, et. seq).] The Mayor of the City of Greenfield is a member of the Board of Works, and pursuant to Departmental policy, "[a]ll rank changes are subject to approval of the Mayor and the Board of Works and Public Safety." [Plaintiff's Response, p. 24 (citing City's webpage at Dkt. No. 42-9); Rank and Promotion Rule #43 (Dkt. No. 38-6).] Chief Jester is unaware of any instances when the Board of Works did not approve the promotion of a recommended candidate. [Jester Dep., p. 30, l. 17 - 19 (Dkt. No. 38-6).]

## I. Plaintiff's Complaint in This Action

Plaintiff filed this action on May 27, 2010. [Plaintiff's Complaint (Dkt. No. 1).] In his Complaint he asserts, pursuant to 42 U.S.C. § 1983, that after he exercised his First Amendment right to petition the courts for redress of grievances (i.e., after he filed the Prior Lawsuit) and exercised his First Amendment right of free speech (i.e., after he complained to the State Board of

Accounts), Defendants retaliated against him for doing so. He submits that this retaliation is manifested, among other things, by the fact that he was not awarded any of the eleven positions for which he applied and by the City's failure to fulfill certain conditions of the Settlement Agreement and Release. He further contends that Defendants' retaliatory conduct violated Indiana's Whistleblower statute, Ind. Code § 36-1-8-8, and that the City's failures constitute a breach of the parties' Settlement Agreement and Release under state contract law.

## II. LEGAL ANALYSIS

### A. Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of *some* alleged factual dispute between the parties," id. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary

judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325. According to the Seventh Circuit's reading of the Celotex standard, summary judgment is appropriate where the non-moving party fails to establish "an element essential to his claim." Beauchamp v. City of Noblesville, 320 F.3d 733, 742 (7th Cir. 2003) (citing Celotex, 477 U.S. at 322).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enters. v. First Chi. Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

### B.  Plaintiff's First Amendment/Retaliation Claims
*(filed against all Defendants)*

To establish a prima facie case of retaliation, a plaintiff must show that: (1) his speech was constitutionally protected; (2) he suffered a deprivation that would likely deter protected speech; and (3) the protected speech was at least a motivating factor in the defendant's action.  Swearnigen-El v. Cook Cnty. Sheriff's Dep't., 602 F.3d 852, 861 (7th Cir. 2010).  If a plaintiff makes this initial showing, the burden shifts to the defendant to produce evidence that it would have taken the action at issue even in the absence of the plaintiff's speech.  Id.  The burden then shifts back to the plaintiff to show that the defendant's proffered explanation for the action taken is pretextual.  Id.

The question of whether a public employee's speech is constitutionally protected involves a two part question of law for the court.  See Kokkinis v. Ivkovich, 185 F.3d 840, 843 - 44 (7th Cir. 1999).  First, we must decide whether the plaintiff's speech addressed a matter of public concern.  Id.  (citing Connick v. Myers, 461 U.S. 138, 147 - 48 (1983)).  If so, we must then balance the plaintiff's interest as a citizen in commenting on matters of public concern against the State's interest as an employer in promoting the efficiency of the public services it performs through its employees.  Id.  (citing Pickering v. Board. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968)).

### 1.  Plaintiff's Complaint to the State Board of Accounts[6]

The parties' briefings address first and focus primarily on Plaintiff's complaint to the State

---

[6]    Plaintiff asserts that after complaining to the State Board of Accounts, he applied for eleven different promotions and/or transfers and was denied all eleven positions.  [Plaintiff's Complaint at ¶¶ 22 & 23 (Dkt. No. 1).]  Plaintiff did not, however, lodge his complaint with the State Board of Accounts until July of 2009, so that complaint could not have been a factor in any employment decision made by Defendants *before* July of 2009.  Plaintiff applied for only *three* positions after filing his State Board of Accounts complaint.

Board of Accounts. Consequently, we will follow their lead and address that complaint first.

Defendants argue that Plaintiff cannot establish a prima facie case of retaliation with respect to the State Board of Accounts complaint because that complaint was not constitutionally protected speech. They contend that Plaintiff's official duties as a police officer included investigating and reporting crime; therefore, he was speaking as an employee of the City of Greenfield Police Department and not as a citizen when he reported the suspected crime of ghost employment to the State Board of Accounts. Defendants rely on Swearingen-El, 602 F.3d at 862, in which the Seventh Circuit, citing Garcetti v. Ceballos, 547 U.S. 410, 421 (2006), stated, "When employees make statements 'pursuant to their official duties,' they are not speaking 'as citizens' for First Amendment purposes."

Plaintiff agrees that, as a police officer, he had (and has) a duty to investigate and report crime. Nevertheless, he asserts that the "relevant inquiry" is not whether he had a duty to investigate and report crime, but *to whom or to what entity* he had the duty to report such crime. He contends that his job as a police officer requires him to report crime only to *law enforcement agencies* and that because the State Board of Accounts is not a law enforcement agency, his complaint to that agency qualifies as constitutionally protected speech.[7] In any event, he asserts, the Seventh Circuit has already ruled that ghost employment when reported to a third party (i.e., a party other than the employer) is a matter of public concern entitled to First Amendment protection. Plaintiff relies on Valentino v. Village of South Chicago Heights, 575 F.3d 664 (7th Cir. 2008), in which the Seventh Circuit stated, "It is by now well-established that speech protesting government waste addresses a

---

[7] Shortly before complaining to the State Board of Accounts, Plaintiff reported Lieutenant Laymon's suspected ghost employment to the Indiana State Police. Plaintiff's report to the Indiana State Police is not at issue in this action.

matter of public concern and is therefore entitled to constitutional protection."

The arguments of both parties are overly simplistic. Defendants would have the Court find that a police officer's speech relating to crime can never be constitutionally protected because speaking out about crime is part of a police officer's official duties, and Plaintiff would have us find that whether speech is constitutionally protected depends on the person or entity to whom or to which the speech was addressed. Neither Swearingen-El nor Valentino, which were decided based on the specific facts presented in those cases, is dispositive of the question before us. We must, therefore, analyze the facts of this case under Connick.

The first step in determining whether a public employee's speech is constitutionally protected is to decide whether the speech addressed a matter of public concern. Kokkinis, 185 F.3d at 843 - 44 (citing Connick, 461 U.S. at 148 n. 7). Whether a public employee's speech addressed a matter of public concern is a question of law, and we answer that question by examining the "content, form, and context" of the speech. Bivens v. Trent, 591 F.3d 555, 560 (7th Cir. 2010) (citing Connick, 461 U.S. at 147 -48 & n. 10). Here, although the specific content of Plaintiff's complaint to the State Board of Accounts has not been made part of the record, the subject matter of Plaintiff's complaint (ghost employment) is recognized to be a topic of public concern, which points toward a finding that said complaint was constitutionally protected speech. See Valentino, 575 F.3d at 672 (observing that speech protesting government waste addresses a matter of public concern). The form of Plaintiff's complaint, a writing of some sort addressed to an outside agency responsible for auditing the financial statements of governmental units, also points towards a finding that said complaint was constitutionally protected speech. See Milwaukee Deputy Sheriff's Assoc. v. Clarke, 574 F.3d 370, 378 (7th Cir. 2009) (finding that a report made to outside labor organization

weighed in favor of a finding of constitutional protection).

Seventh Circuit precedent makes clear, however, that just because a public employee speaks up on a subject that is recognized to be one of public concern and addresses his speech to a body or entity other than his employer does not mean that the employee's speech is automatically protected by the First Amendment. <u>Bivens</u>, 591 F.3d at 560 - 61. The *context* of the speech must also be considered, and, in considering the context of the speech, the *motive* underlying the speech, though not dispositive, is relevant because speech is not constitutionally protected if its only "point" was to further some purely private interest. <u>Id.</u> at 561. Accordingly, we must consider the context, including the underlying motive, of Plaintiff's complaint to the State Board of Accounts because it may clarify the central point of Plaintiff's complaint and assist us in determining whether he spoke up about Lieutenant Laymon's suspected ghost employment as a concerned citizen or whether, instead, he sought to further some purely personal interest (such as a personal grudge) arising out of his employment with the City of Greenfield Police Department. <u>See</u> <u>Campbell v. Towse</u>, 99 F.3d 820, 827 (7th Cir. 1996) (discussing why an employee's motivation is relevant).

The context or circumstances under which Plaintiff made his complaint to the State Board of Accounts, as revealed by the undisputed facts of this case, persuades us that Plaintiff did not complain about Lieutenant Laymon's suspected ghost employment as a concerned citizen. Rather, he was motivated to speak based on his own purely personal interest in seeing Lieutenant Laymon, a man he did not like, be embarrassed or punished. This purely personal interest and motivation is revealed by the fact of the longstanding and generally known "personality conflict" and "tumultuous" relationship between Plaintiff and Lieutenant Laymon. It is further elucidated by the fact that Plaintiff, who previously did not want to work the third shift under someone with whom

he did not get along (Lieutenant Laymon, perhaps?), changed his mind when he heard a rumor that Lieutenant Laymon might be engaged in ghost employment prompting him to request to work the third shift for the purpose (notably, a purpose that he did not initially disclose to his superiors) of conducting his own investigation in order to "catch" Lieutenant Laymon. Moreover, when the Department's official investigation of Lieutenant Laymon -- an investigation in which Plaintiff did not participate and was not privy to the results -- did not lead the Department to sanction Lieutenant Laymon in a manner that Plaintiff considered to be sufficiently punitive, Plaintiff complained to his superiors that Lieutenant Laymon's punishment was "bullshit." His wholly personal interest and motivation is underscored by the fact that Plaintiff did not act with diligence in taking his suspicions about ghost employment to the State Board of Accounts, but did so only *after* he decided that the Department's official investigation had not by his standards resulted in a suitable sanction for Lieutenant Laymon. It is equally evident from Plaintiff's deposition testimony, explaining that the reason he went to the State Board of Accounts was because he felt that Lieutenant Laymon had not been "disciplined" and that there had not been a proper "outcome" for him. At the time Plaintiff made his complaint to the State Board of Accounts, he was harboring an obvious hostility against Lieutenant Laymon and was not speaking to him because he believed that Lieutenant Laymon had "lied" to the Chief about him. Further Plaintiff's purely personal interest and motivation is revealed by Plaintiff's conduct following his complaint to the State Board of Accounts as he persisted in his efforts to see Lieutenant Laymon be punished and filed a grievance against Lieutenant Laymon, once again asking the Chief Jester to punish him. [Plaintiff's 9/23/2009 Memo to Chief Jester (Dkt. No. 38-13) ("I not only take [Lieutenant Laymon's comments] as a personal strike against me, but one that I hope will bring about a *harsh and appropriate disciplinary punishment*.") (emphasis

15

added).]

Finally, and not insignificantly, Plaintiff's purely personal interest and motivation is clear from the fact that the record is devoid of evidence that Plaintiff ever expressed a larger or more global concern for the misuse of public resources, the waste of public tax dollars, or the intent to raise an issue for public discussion. Indeed, Plaintiff's testimony in this case focuses entirely on *Lieutenant Laymon*, in terms of "watching," "observing," and "catching" him, and in terms of seeing him be "punished," "disciplined," and "sanctioned." The evidence simply fails to establish that Plaintiff had any purpose other than a personal one in seeing Lieutenant Laymon be punished based on his dislike of the man.

Of course, we must draw all reasonable inferences in Plaintiff's favor, and it could be argued that Plaintiff's larger or more global concern for the misuse of public resources or public tax dollars, including an intent to bring wrongdoing to public light, should be inferred from the fact of his complaint to the State Board of Accounts. The uncontroverted evidence before us does not permit that inference. Given that Plaintiff's written complaint to the State Board of Accounts is not part of the record before us, we conclude that drawing such an inference from the mere fact of that complaint is a bridge too far. In other words, such an inference would not be reasonable in light of the overwhelming evidence before us that is in the record, which plainly indicates that Plaintiff was motivated by the desire to see a man whom he strongly disliked be punished.

It could also be argued that we should consider this to be a hybrid case – one where the speech at issue was motivated in part by personal interests, but also in part by larger public concerns. We reject that theory as well. Based on the record before us, the only way to find that Plaintiff was motivated by some larger public concern is to infer that from the mere fact from his complaint, and,

as addressed above, we believe that such an inference would be patently unreasonable. <u>See Milwaukee Deputy Sheriff's Assoc.</u>, 574 F.3d at 378 (finding that a sheriff's deputy did not act with mixed motives where his speech focused on the conduct of his superior, the sheriff, and did not comment directly on the waste of taxpayer dollars or raise the public ramifications of the sheriff's conduct).

Because Plaintiff did not complain to the State Board of Accounts as a concerned citizen, but rather, to further a purely personal interest (one might say, vendetta) arising out of his employment with the City of Greenfield Police Department, we find that his complaint did not constitute constitutionally protected speech. Plaintiff has, therefore, failed to establish a prima facie case of retaliation with respect to his State Board of Accounts complaint.

Even if we had found that Plaintiff's complaint to the State Board of Accounts was constitutionally protected speech, we would nevertheless conclude that Plaintiff cannot establish a prima facie case of retaliation. To establish a prima facie case of retaliation, Plaintiff must show a *causal connection* between his complaint to the State Board of Accounts and the Department's awarding the three positions at issue to persons other than Plaintiff. <u>Swearnigen-El</u>, 602 F.3d at 861; <u>Watkins v. Kasper</u>, 599 F.3d 791, 794 (7th Cir. 2010).

Defendants assert that Plaintiff cannot establish such causal connection because neither Chief Jester nor any of the members of the three interview panels knew that Plaintiff was the one who complained to the State Board of Accounts, so their decisions could not have been influenced by that fact. They note that during the relevant time period, Plaintiff expressly *denied* that he was the one who lodged the complaint. Plaintiff responds that despite his denial, Chief Jester and the members of the three interview panels *must have known* he had lodged the complaint. He points out that

before he was interviewed for the three positions at issue, he had alerted his superiors within the Department that he suspected Lieutenant Laymon of ghost employment and complained to Chief Jester that Lieutenant Laymon's punishment was "bullshit." He also points out that Lieutenant Laymon was on two of the three interview panels following his complaint to the State Board of Accounts and asserts that because Chief Jester was aware that the two men did not get along, Chief Jester must have acted with a retaliatory animus in appointing Lieutenant Laymon to those panels.

Summary judgment is the "put up or shut up moment" in a lawsuit when a plaintiff must present evidence that would convince a trier of facts to accept his version of events, Arnett v. Webster, 658 F.3d 742, 760 (7th Cir. 2011), and self-serving speculation will not suffice. Albiero, 246 F.3d at 933. In this case, Plaintiff has offered nothing more than his own self-serving speculation to causally connect Defendant's employment decisions after July of 2009 to his State Board of Accounts complaint.

Although Plaintiff asserts (speculates) that no one in the Department reasonably could have believed that anyone other than he had made the complaint, his own deposition testimony establishes that there were several other people who might have complained. Indeed, Plaintiff testified that he learned of Lieutenant Laymon's rumored ghost employment from others within the Department and that Will Phillips, Rich Wilcher, Corporal Koch, and Patrolman Thomas all suspected Lieutenant Laymon of ghost employment. [Plaintiff's Dep., p. 59, l. 2 - 19 (Dkt. No. 42-1).] Moreover, despite Plaintiff's contention (speculation) that a retaliatory animus is the reason Chief Jester placed Lieutenant Laymon on two of the three interview panels, there is no evidence suggesting that Chief Jester *first* reviewed the applications and only appointed the interview panel members *after* seeing who had applied. The Chief may very well have appointed the members of the interview panels

*before* the applications were received. In any event, Brent Inman, one of Plaintiff's "closest friends" within the City of Greenfield Police Department, also sat on one of the same interview panels along with Lieutenant Laymon. [Id., p. 104, l. 13 - 14 (Dkt. No. 42-1); Plaintiff's Dep., p. 50, l. 2 - 17 (Dkt. No. 38 - 5).] The fact that this interview panel included one of Plaintiff's "closest friends" dispels the notion that Chief Jester staffed the interview panels with people disinclined to give Plaintiff fair consideration in retaliation for Plaintiff's complaint to the State Board of Accounts.

### 2. Plaintiff's Prior Lawsuit

After the Prior Lawsuit was settled and before his July 2009 complaint to the State Board of Accounts, Plaintiff applied for eight different positions within the Department, none of which he was awarded. Defendants assert that Plaintiff was not awarded any of those positions because:

> there were more qualified applicants. The decision not to select Plaintiff for the positions . . . was based upon a combination of factors, including: other applicants had higher rank, more experience, better interpersonal skills, better workmanship, disciplinary actions that were less severe and/or lower in quantity, and took more initiative within the Department.

[Defendant's Response to Interrogatory No. 4 (Dkt. No. 42-4).]

Defendants point out that the Prior Lawsuit was settled in November or December of 2007,[8] that over six months transpired between the settlement and the date that Plaintiff submitted his next application for promotion or transfer, and that in the interim, an entirely new governing administration was installed – i.e., a different mayor (interestingly, the same person Plaintiff had supported in the election, which triggered the events captured in the Prior Lawsuit, but more about

---

[8]     Plaintiff executed the Settlement Agreement and Release on January 4, 2008, so it seems probable that the parties negotiated their agreement to resolve the case in the final months of 2007. [Settlement Agreement and Release (Dkt. No. 38-3).]

that later) and a different police chief were in place at the time Plaintiff applied for the eight positions at issue than were in place when Plaintiff filed and settled his Prior Lawsuit.  [Defendant's Brief, p. 17 (Dkt. No. 37); Defendant's Reply Brief, p. 7 (Dkt. No. 43).]  They argue that given the amount of time that transpired and the change in administration, a retaliatory motive simply cannot reasonably be attributed to their employment decisions.

Plaintiff contends that there can be no explanation *but* retaliation for the fact that he was not awarded any of these eight positions because: (1) he had more seniority than all but one of two of the successful applicants; (2) he had served as a Field Training Officer and trained most of the successful applicants; (3) he had a better disciplinary record than one of the successful applicants; and (4) he had a better performance record than another successful applicant.  Plaintiff further argues that no positions were posted before July of 2008; therefore, Defendants had no opportunity to retaliate against him until July of 2008.  He argues that Defendants did not follow their own written policies, which required them to administer written tests to the candidates for promotion and also have a citizen member on each interview panel.  Finally, he argues that Defendants did not retain any of the notes made by members of the interview panels, including how the respective candidates ranked in the interview process; therefore, he urges the Court to discredit Defendants' stated reasons for not awarding him any of the eight positions and find those reasons pretextual.

The parties do not dispute that the Prior Lawsuit qualifies as constitutionally protected speech, so the issue to be resolved is whether there is evidence of a causal connection between the Prior Lawsuit and Defendants' decisions to award the eight positions at issue to persons other than Plaintiff.  We find that no such evidence exists to prove causation.

A plaintiff may demonstrate retaliatory animus by presenting evidence that an adverse

employment decision "took place on the heels" of his protected speech. George v. Walker, 535 F.3d 535, 539 (7th Cir. 2008). However, timing alone does not establish causation. Id. "The inference that protected speech was the motive for an adverse employment decision weakens as the time between the protected expression and the adverse action increases, and additional proof of a nexus is required." Id. Here, a period of at least six months transpired between the settlement of the Prior Lawsuit and the date of Plaintiff's next application for promotion or transfer. The passage of such time requires "additional proof of a causal nexus." Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998) (lapse of five months requires additional proof of a causal nexus); Hughes v. Derwinski, 967 F.2d 1168, 1174 - 75 (7th Cir. 1992) (lapse of four months requires additional proof of a causal nexus); Juarez v. Ameritech Mobile Commc'ns, Inc., 957 F.2d 317, 321 (7th Cir. 1992 (lapse of nearly six months requires additional proof of a causal nexus). Plaintiff is required to come forward with evidence of something more than just the chronology of events.

Plaintiff's contention that he was a "better candidate than many of the successful applicants" does not qualify as that "something more," for it is, once again, purely Plaintiff's personal and entirely speculative view. Plaintiff has not explained how or why his seniority in the Department necessarily made him a better candidate for any of the eight positions at issue. He has not explained what a Field Training Officer does and why having served in that capacity would have made him a better qualified candidate. He submits that he had a better disciplinary record than one of the successful applicants, but he overlooks and/or minimizes his own disciplinary history. See Jester Dep., p. 47, l. 22 - 48, l. 5 (Dkt. No. 42-2) (reporting that Plaintiff had "several write-ups" and "a couple of suspensions"); see also Complaint in Prior Lawsuit at ¶¶ 14 & 19 (Dkt. No. 38-1) (describing other discipline, although Plaintiff alleged that it was unwarranted). And, based on his

longstanding and generally known "personality conflict" with Lieutenant Laymon, it seems likely that Plaintiff did in fact have some issues with his interpersonal skills.

Defendants' failure to follow their own written policies may be something of an embarrassment to Defendants, particularly to Chief Jester, who seemed unfamiliar with those written policies at his deposition. However, the fact that Defendants did not follow certain written policies does not by itself indicate a causal connection between Plaintiff's Prior Lawsuit and Defendants' employment decisions, especially when Plaintiff has failed to explain the relevance of Defendants' failures. He has not claimed that he was treated differently than the other applicants with respect to the application (or non-application) of the policies at issue. He has not claimed that all of the other applicants were given a written test when he was not, and he has not suggested that the Department dispensed with written testing because it expected that he would be the highest scoring applicant. Similarly, he has not explained how or why having a citizen member on the interview panel would have influenced or changed Defendants' employment decisions, and he has not claimed that the other applicants had citizen members on their interview panels when he did not.

The fact that Defendants did not retain the notes taken by the members of the interview panels also fails to establish the necessary causal connection. Plaintiff's claim that those notes would have shown that Defendants acted with a retaliatory animus is, once again, self-serving speculation.

Most telling, however, is the fact that Plaintiff has not offered any explanation why Chief Jester or Mayor Dereamor would have wanted to retaliate against him for filing the Prior Lawsuit. Plaintiff's Prior Lawsuit involved the claim that the *prior* administration (i.e., *former* Mayor Rodney Fleming and *former* Police Chief Clarke Mercer) retaliated against him with respect to the

conditions of his employment for speaking publicly back in 2007 about his intent to vote for *then*-mayoral candidate Brad Dereamor. After winning the election, Brad Dereamor, in his capacity as the newly elected mayor, executed the Settlement Agreement and Release that was negotiated before he took office on behalf of the defendants named in the suit. However, that fact does not explain why he would thereafter seek to retaliate against Plaintiff. The Prior Lawsuit did not name Brad Dereamor as a defendant or in any way cast him in a negative light. In the Prior Lawsuit, Plaintiff sought to vindicate his right to state publicly that he was going to vote for Brad Dereamor for Mayor. The Prior Lawsuit thus suggested Plaintiff's high regard for Brad Dereamor, – i.e., that Plaintiff was going to vote for him. Similarly, Prior Lawsuit did not name John Jester as a defendant or cast him in a negative light. Nor has Plaintiff offered any explanation why Chief Jester, a man appointed to the position by Mayor Dereamor and who presumably would not be Chief of the City of Greenfield Police Department had Brad Dereamor lost the election, would want to retaliate against Plaintiff for filing that lawsuit. In fact, Plaintiff testified by deposition that Chief Jester told him that "he didn't care about the lawsuit one way or another." [Plaintiff's Dep., p. 119, l. 1 - 7 (Dkt. No. 42-1).]

Because neither Mayor Dereamor or Chief Jester was named as a defendant in the Prior Lawsuit, because Plaintiff has offered no explanation why either man would have a reason to retaliate against him for filing that suit, and because the evidence does not suggest that Defendants' proffered reasons for awarding the eight positions at issue to persons other than Plaintiff are pretextual, we find no causal connection between Plaintiff's filing of the Prior Lawsuit and his

failure to be awarded the positions at issue.[9]

## C.  Plaintiff's State Law Whistleblower Claim
*(filed against the City of Greenfield and the City of Greenfield Police Department only)*

Defendants assert that they are entitled to summary judgment with respect to Plaintiff's whistleblower claim under Indiana Code § 36-1-8-8 because that statute does not create a private cause of action.  They cite Kodrea v. City of Kokomo, 458 F. Supp. 2d 857, 874 (S.D. Ind. 2006), in which former Chief Judge Larry McKinney of our court very plainly held this statute "does not provide [] a private right of action."  Plaintiff responds that Kodrea was called into question by the Seventh Circuit's ruling in Ellis v. CCA of Tenn., LLC, 650 F.3d 640, 651 n. 4 (7th Cir. 2011), wherein the appellate court said, "We assume without deciding that Indiana Courts would allow for a whistle blower action to be maintained under the code."  [Plaintiff's Response Brief, p. 22 (Dkt. No. 41).][10]

The issue here requires little discussion.  Plaintiff's whistleblower claim was brought under Indiana Code § 36-1-8-8.  [Plaintiff's Complaint at ¶¶ 1,  10, & 11 (Dkt. No. 1).]  The Ellis case addressed a *different* whistleblower statute – namely, Indiana Code § 22-5-3-3.  Judge McKinney, in finding that Indiana Code § 36-1-8-8 does not provide a private cause of action, *distinguished* Indiana Code § 36-1-8-8  from Indiana Code § 22-5-3-3, explaining that Indiana Code § 22-5-3-3 provides for a civil remedy, but Indiana Code § 36-1-8-8 does not.  Judge McKinney's reasoning remains sound, and we interpret Indiana Code § 36-1-8-8 no differently now than he did in Ellis.

---

[9]    Because we find that there were no constitutional violations, it is not necessary to address Defendants' qualified immunity and Monell arguments.

[10]    Plaintiff has misquoted the Seventh Circuit's ruling, which actually states,  "We assume without deciding that Indiana Courts would allow for a whistle blower action to be maintained under the code *based on a constructive discharge theory*."  Ellis, 650 F.3d at 651 n. 4

### D.  Plaintiff's Breach of Contract Claims
*(filed against the City of Greenfield only)*

#### 1.  Fair Consideration for Promotions/Transfers

Because Plaintiff's state law breach of contract claim relating to the City's alleged failure to give him "fair consideration in the selection process" is based on the same facts and intertwined with Plaintiff's First Amendment/Retaliation claims (and the parties, in their briefings, have intertwined the two issues and addressed them together), we need not repeat here our detailed recitation of the facts.  Suffice it to say there are no facts to support this cause of action.  We, therefore, GRANT summary judgment in favor of the City on Count II of Plaintiff's Complaint with respect to that aspect of Plaintiff's state law breach of contract claim.

#### 2.  Drug Recognition Examiner School

Plaintiff argues that the City completely failed to address its failure to send him to Drug Recognition Examiner School and asks the Court to enter summary judgment in his favor on that issue.  [Plaintiff's Response Brief, p. 23 (Dkt. No. 41).]  It is no surprise, however, that the City did not address that issue in its Motion for Summary Judgment since Plaintiff's Complaint does not reference this as a basis for a breach of contract claim.

It is true that Plaintiff mentions the City's failure to send him to Drug Examiner Recognition school in his Complaint.  However, it is referenced simply as a fact in support of his other claims and not as a separate claim all its own.  [Plaintiff's Complaint (Dkt No. 1); compare ¶ 19 under heading "Factual Allegations" and ¶ 31 under heading "Count II  Breach of Contract Against the City".]  Count II of Plaintiff's Complaint asserts breach of contract claims based *only* on: (1) the City's "failure to reinstate Plaintiff's contracts for snow removal and grass cutting," and  (2) the

City's "failure to allow Plaintiff to apply for and receive fair consideration in the application process." [Plaintiff's Complaint at ¶ 31 (Dkt. No. 1).] Because the City's alleged failure to send Plaintiff to Drug Recognition Examiner School is not asserted in Plaintiff's Complaint as a breach of contract, that claim is not before the Court, and we will not address it further.

### 3. Lawn and Snow Removal

Plaintiff also contends that the City of Greenfield breached the Settlement Agreement and Release when it failed to reinstate his contracts for snow removal and grass cutting. [Plaintiff's Complaint at ¶ 31 (Dkt. No. 1).] The City rejoins that it is entitled to summary judgment on this issue because: (1) there was never any agreement between the parties as to how long the contracts would remain in effect; (2) Plaintiff himself never performed under the alleged contracts; and (3) because employment contracts are terminable at will, the City was free to terminate the contracts at any time and its inactivity in response to those agreements implies its decision to terminate them. Plaintiff argues that the City should be estopped from asserting a right to terminate his contracts at any time because the contracts were "service contracts" and not "employment contracts" and the City induced him into signing the Settlement Agreement and Release by promising to reinstate the contracts.

Although Plaintiff has not explained how characterizing his contracts as "service contracts" rather than "employment contracts" makes a difference here, we agree with Plaintiff that the doctrine of promissory estoppel prevents the City from denying the promises it made in the Settlement Agreement and Release. Those promises no doubt induced Plaintiff to settle and dismiss the Prior Lawsuit, and the City cannot prevail on its post hoc argument that its promises made in that context meant nothing.

However, as the City points out, Plaintiff himself failed to perform under the contracts at issue, a fact which Plaintiff concedes. Significantly, neither party has offered an explanation as to why the grass cutting agreement was apparently abandoned.[11] It is thus unclear whether, after settling the Prior Lawsuit, Plaintiff did not show up to do the work, forcing the City to make other arrangements, or whether the City never gave Plaintiff the opportunity to do the work. Given that the parties' agreement was never reduced to writing and noting the lack of facts before us on virtually all the relevant issues that must be established for Plaintiff to prevail on this claim, we cannot enter summary judgment on it based on the sparse record before us.

### III. CONCLUSION

For the reasons set forth above, we GRANT summary judgment in favor of Defendants and against Plaintiff on all claims asserted in Plaintiff's Complaint, *except* for Plaintiff's state law breach of contract claim regarding the reinstatement of his contracts for grass cutting and snow removal as set forth in Count II of Plaintiff's Complaint. Given the apparent weakness of this claim as referenced above, we direct Plaintiff to advise the Court within twenty days whether he intends to proceed to fully litigate this remaining vestige of his lawsuit or will dismiss it voluntarily. If Plaintiff does not choose to abandon this claim, the Magistrate Judge is requested to set the matter for a prompt conference with the attorneys.

IT IS SO ORDERED.

Date: ____03/29/2012____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[11] City Attorney Morelock's March 8, 2010, letter to Plaintiff's attorney, Meghan Lehner, addressed only the contract for snow removal and was silent with respect to the contract for grass cutting. [Letter (Dkt. No. 38-4).]

Copies to:

John H. Haskin
HASKIN LAUTER  & LARUE
jhaskin@hlllaw.com

Meghan Uzzi Lehner
HASKIN LAUTER  & LARUE
mlehner@hllglaw.com

Anthony W. Overholt
FROST BROWN TODD LLC
aoverholt@fbtlaw.com

Ryan Patrick Sink
JOHN H. HASKIN & ASSOCIATES
rsink@hlllaw.com